**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

                  **Plaintiff(s),**        **CASE NUMBER: 09-20224**
                                         **HONORABLE VICTORIA A. ROBERTS**

**v.**

**GEORGE WILLIAMS,**
**NEIL CHAPPLE,**

                  **Defendant(s).**
_____/

**ORDER DENYING DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE OBTAINED OR DERIVED FROM ILLEGAL**
**INTERCEPTION OF WIRE COMMUNICATIONS**

**I.**      **BACKGROUND AND PROCEDURAL HISTORY**

      **A.**    **Factual Background**

Defendant George Williams is charged with: (1) Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1); (2) Health Care Fraud, in violation of 18 U.S.C. §1347; (3) Unlawful Payments, in violation of 42 U.S.C. §1320a-7b; (4) Possession with Intent to Distribute Controlled Substances - Cough Syrup with Codeine, in violation of 21 U.S.C. §841(a)(1); and (5) Possession with Intent to Distribute Controlled Substances - Oxycodone, in violation of 21 U.S.C. §841(a)(1).

In the General Allegations section of the Indictment, the Government alleges that Williams organized and operated a purported health care business under the name Quick Response Medical Professionals, P.C. ("QRMP").  Williams recruited fake

1

patients to see doctors employed by QRMP. Most of the patients were scheduled for doctor visits by co-Defendant Yolando Young, who instructed the patients to ask for prescriptions for drugs with a high street value, such as OxyContin 80mg, Xanax, Viccodin, Viccodin ES, and cough syrup containing codeine. QRMP employees retained the prescriptions. The fake patients were paid up to $220 in cash for their time and use of their Medicare card for billing purposes.

Williams had the prescriptions filled at various cooperating pharmacies, including Eastside Discount Pharmacy and Westside Discount Pharmacy. He paid cash for the drugs, and co-defendants Ernest Adams and Webb Smith delivered the drugs to distributors in exchange for money.

**B.    August 5, 2008 Wiretap Application, Affidavit, and Order; and, September 5, 2008 Extension Application, Affidavit, and Order**

**1.    August 5, 2008 Wiretap Application, Affidavit, and Order**

On August 5, 2008, an Assistant United States Attorney ("AUSA") for the Eastern District of Michigan, submitted an Application for an Order Authorizing the Interception of Wire Communications To and From Cellular Telephone Number 313-647-6583, which was used by Young.

The Application was supported by an Affidavit from Special Agent Christopher Dziedzic ("SA Dziedzic") of the Drug Enforcement Administration in Detroit, Michigan.

The AUSA sought:

> authorization to intercept wire communications of YOLANDO VONALDO YOUNG, a/k/a "Yolanda"; GEORGE KEVIN WILLIAMS, a/k/a Kevin Williams, George (no middle name) Williams, Keith Smith and Rick Williams; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS; GREGORY LEE PALMER; QUICK RESPONSE MEDICAL PROFESSIONALS; LOUIS RAY BELL; ERNEST LARRY ADAMS;

2

ELEANOR MANIQUIS; EASTSIDE DISCOUNT PHARMACY and others
as yet unknown . . . concerning offenses . . . involving (a) the distribution
and possession with intent to distribute narcotic controlled substances, in
violation of [21 U.S.C. §841(a)(1)]; (b) the use of communications facilities
in commission of narcotics offenses, in violation of [21 U.S.C. §843(b)]; (c)
attempts and conspiracies to commit the aforementioned crimes, in
violation of [21 U.S.C. §§ 846 and 963]; (d) money laundering and
conspiracy to commit money laundering, in violation of [18 U.S.C. §§ 1956
and 1957]; and (e) aiding and abetting the aforementioned crimes, in
violation of [18 U.S.C. §2].

An Order authorizing the interception was signed by a United States District

Judge for the Eastern District of Michigan on August 5, 2008.

### 2.    September 5, 2008 Extension Application, Affidavit, and Order

On September 5, 2008, the AUSA submitted an Application for an extension of

the August 5, 2008 Order.  The Application was supported by an Affidavit from SA

Dziedzic.  SA Dziedzic's Affidavit incorporates by reference his Affidavit dated August 5,

2008.

The AUSA sought:

authorization to intercept wire communications of YOLANDO VONALDO
YOUNG, a/k/a "Yolanda"; GEORGE KEVIN WILLIAMS, a/k/a Kevin
Williams, George (no middle name) Williams, Keith Smith and Rick
Williams; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS;
GREGORY LEE PALMER; QUICK RESPONSE MEDICAL
PROFESSIONALS; LOUIS RAY BELL; ERNEST LARRY ADAMS;
NATHANIEL DARYL WILLIAMS; ERIN BETHANY WILLIAMS; NANCY
ROCHELLE WILLIAMS; HENRY LEE MILLER; TINA MARIE
HOLLOWAY; ELEANOR MANIQUIS; EASTSIDE DISCOUNT
PHARMACY and others as yet unknown . . . concerning offenses . . .
involving (a) the distribution and possession with intent to distribute
narcotic controlled substances, in violation of [21 U.S.C. §841(a)(1)]; (b)
the use of communications facilities in commission of narcotics offenses,
in violation of [21 U.S.C. §843(b)]; (c) attempts and conspiracies to commit
the aforementioned crimes, in violation of [21 U.S.C. §§ 846 and 963]; (d)
money laundering and conspiracy to commit money laundering, in
violation of [18 U.S.C. §§ 1956 and 1957]; (e) paying Medicare
beneficiaries to sign for unnecessary medical services and utilizing

Medicare prescription drug coverage to pay for prescription narcotic medications not provided to the beneficiary, in violation of [18 U.S.C. §1347]; and (f) aiding and abetting the aforementioned crimes, in violation of [18 U.S.C. §2].

An Order authorizing the extension was signed by a United States District Judge for the Eastern District of Michigan on September 5, 2008.

### C.   October 7, 2008 Application, Affidavit, and Order; and, November 6, 2008 Extension Application, Affidavit, and Order

#### 1.   October 7, 2008 Application, Affidavit, and Order

On October 7, 2008, the AUSA submitted an Application for an Order Authorizing the Interception of Wire Communications To and From Cellular Telephone Numbers 313-768-6117 and 313-399-6050, which were used by Williams.

The Application was supported by an Affidavit from SA Dziedzic.  SA Dziedzic's Affidavit incorporates by reference his Affidavits dated August 5, 2008 and September 5, 2008.

The AUSA sought:

authorization to intercept wire communications of GEORGE KEVIN WILLIAMS, a/k/a Kevin Williams, George (no middle name) Williams, Keith Smith and Rick Williams; YOLANDO VONALDO YOUNG, a/k/a "Yolanda"; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS; GREGORY LEE PALMER; QUICK RESPONSE MEDICAL PROFESSIONS; LOUIS RAY BELL; ERNEST LARRY ADAMS; ELEANOR MANIQUIS; MILAGROS EBREO; EASTSIDE DISCOUNT PHARMACY and others as yet unknown . . . concerning offenses . . . involving (a) the distribution and possession with intent to distribute narcotic controlled substances, in violation of [21 U.S.C. §841(a)(1)]; (b) the use of communications facilities in commission of narcotics offenses, in violation of [21 U.S.C. §843(b)]; (c) attempts and conspiracies to commit the aforementioned crimes, in violation of [21 U.S.C. §§ 846 and 963]; (d) money laundering and conspiracy to commit money laundering, in violation of [18 U.S.C. §§ 1956 and 1957]; . . . (e) paying Medicare beneficiaries to sign for unnecessary medical services and utilizing

4

Medicare prescription drug coverage to pay for prescription narcotic medications not provided to the beneficiary, in violation of [18 U.S.C. §1347]; and [(f)] aiding and abetting the aforementioned crimes, in violation of [18 U.S.C. §2].

An Order authorizing the interception was signed by a United States District Judge for the Eastern District of Michigan on October 7, 2008.

### 2.    November 6, 2008 Extension Application, Affidavit, and Order

On November 6, 2008, the AUSA submitted an Application for an extension of the October 7, 2008 Order.  The Application was supported by an Affidavit from SA Dziedzic.  SA Dziedzic's Affidavit incorporates by reference his Affidavits dated August 5, 2008, September 5, 2008, and October 7, 2008.

The AUSA sought:

authorization to intercept wire communications of GEORGE KEVIN WILLIAMS, a/k/a Kevin Williams, George (no middle name) Williams, Keith Smith and Rick Williams, YOLANDO VONALDO YOUNG, a/k/a "Yolanda"; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS; GREGORY LEE PALMER; QUICK RESPONSE MEDICAL PROFESSIONALS; LOUIS RAY BELL; ERNEST LARRY ADAMS; ELEANOR MANIQUIS; MILAGROS EBREO; EASTSIDE DISCOUNT PHARMACY; KATRINA LYONS; MICHAEL MCDONALD; JAMES MCKARGE; NEIL MARLEY CHAPPLE; MAHMOUD ABDULILAH FARDOUS; MUNIF NASIR (or NASSER) MAWRI; ALI MOHAMAD FARDOUS; MIKE LNU, LUKE JONES; MARLENE TROTTER and others as yet unknown . . . concerning offenses . . . involving (a) the distribution and possession with intent to distribute narcotic controlled substances, in violation of [21 U.S.C. §841(a)(1)]; (b) the use of communications facilities in commission of narcotics offenses, in violation of [21 U.S.C. §843(b)]; (c) attempts and conspiracies to commit the aforementioned crimes, in violation of [21 U.S.C. §§ 846 and 963]; (d) money laundering and conspiracy to commit money laundering, in violation of [18 U.S.C. §§ 1956 and 1957]; . . . (e) paying Medicare beneficiaries to sign for unnecessary medical services and utilizing Medicare prescription drug coverage to pay for prescription narcotic medications not provided to the beneficiary, in violation of [18 U.S.C. §1347]; and [(f)] aiding and abetting the aforementioned crimes, in violation of [18 U.S.C. §2].

5

An Order authorizing the extension was signed by a United States District Judge for the Eastern District of Michigan on November 6, 2008.

### D.      Procedural History

On December 11, 2009, Williams filed a "Motion to Suppress Evidence Obtained or Derived from Illegal Interception of Wire Communications."  (Doc. #126).

On January 29, 2010, Magistrate Judge Virginia M. Morgan submitted a Report and Recommendation ("R&R") recommending the Court DENY Defendant's motion. (Doc. #161).  According to the Magistrate Judge, SA Dziedzic's Affidavits satisfy the requirements of 18 U.S.C. §2518(3)(c) (issuing judge must determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous").

Before the Court is Williams' "Objections to Magistrate Judge Morgan's Report and Recommendation to Deny Defendant's Motion to Suppress Evidence Obtained or Derived from Illegal Interception of Wire Communications."  (Doc. #166).  Williams asks the Court to suppress evidence obtained or derived from the wiretaps.

In the alternative, Williams requests an evidentiary hearing to determine the extent of the information that SA Dziedzic omitted from his Affidavits in support of the wiretap Applications.

Defendant Neil Chapple joins in Williams' objections.  (Doc. #168).

## II.    BRIEF OVERVIEW OF TITLE III OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968

Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §2510 *et seq.*, after the Supreme Court's decisions in *Berger*

*v. New York*, 388 U.S. 41 (1967) (New York's statute that allowed a judge to issue an *ex parte* order for eavesdropping violates the Fourth and Fourteenth Amendments) and *Katz v. United States*, 389 U.S. 347 (1967) (electronically recording words spoken into a telephone receiver in a public telephone booth constituted a search and seizure under the Fourth Amendment and does not comply with constitutional standards without prior judicial sanctions and attendant safeguards).  *See Scott v. United States*, 436 U.S. 128, 130 (1978).

The purpose of Title III is to regulate and control warrants for wiretaps.  *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988).  It creates limited authority for electronic surveillance in the investigation of specified crimes thought to lie within the province of organized criminal activity.  *United States v. Kalustian*, 529 F.2d 585, 588 (9th Cir. 1975) (citing S. Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2153).  Under Title III, the Federal Government can conduct electronic surveillance, if it obtains judicial authority to do so and conducts the surveillance under carefully defined circumstances.  *Id.*  "Procedural steps provided in [Title III] require strict adherence."  *Id.* (citing *United States v. Giordano*, 416 U.S. 505 (1974)).

> Within our prescribed limits, . . . the utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III. [Title III] has been declared constitutional only because of its precise requirements and its provisions for close judicial scrutiny.

*Id.* at 589 (citations omitted); *see also Alfano*, 838 F.2d at 161 ("The basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III") (citations omitted).

### III.    APPLICABLE LAW AND ANALYSIS

#### A.    Government's Duty to Show a Wiretap is Necessary

"Generally, the government must overcome the statutory presumption against granting a wiretap application by showing necessity."  *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (citing *United States v. Giordano*, 416 U.S. 505, 515 (1974); *United States v. Bailey*, 607 F.2d 237, 241 n.11 (9th Cir. 1979)); *see also* 18 U.S.C. §2518(1)(c):

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter . . . shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]

The necessity requirement serves three purposes.  First, it limits the use of wiretaps, which are highly intrusive.  *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) (citations omitted).  Second, it ensures a wiretap "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). Third, "the necessity requirement protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)); *see also Kalustian*, 529 F.2d at 589-90:

> Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications.  These procedures were not to be routinely employed as the initial step in criminal investigation.

(Quoting *United States v. Giordano*, 416 U.S. 505 (1974)).

The Government is not required to prove that it tried every other conceivable method and failed; that it exhausted all avenues of investigation; or, that all other means were absolutely impossible. *Alfano*, 838 F.2d at 163-64. "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985) (citing *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984); *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir. 1984)).

A purely conclusory affidavit that does not contain information about the particular facts of the case is inadequate because it does not provide facts from which a detached judge or magistrate can determine whether alternative investigative procedures exist as a viable alternative. *See Kalustian*, 529 F.2d at 590; *see also* 18 U.S.C. §2518(3)(c):

> the judge may enter an ex parte order . . . authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting . . . if the judge determines on the basis of the facts submitted by the applicant that[] normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

The application must be denied if the Government does not allege specific circumstances that render traditional investigative techniques ineffective. *Ippolito*, 774 F.2d at 1486 (citing *United States v. Abascal*, 564 F.2d 821, 825-86 (9th Cir. 1977);

*United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975)); *see also United States v. Robinson*, 698 F.2d 448, 453 (D.C.Cir. 1983):

> we must be careful not to permit the government merely to characterize a case as a "drug conspiracy" . . . that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.

(Emphasis in original) (citations omitted).

In determining whether SA Dziedzic's Affidavits satisfy the necessity requirement, the Court views the information "in a practical and common sense fashion." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (citing S.Rep. No. 1097, 1968 U.S.Code Cong. & Ad.News, p. 2190); *see also Kalustian*, 529 F.2d at 589:

> [w]here [the underlying circumstances in the affidavit] are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense[sic], manner.

(Quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

If the necessity requirement is not met, the Court must suppress any evidence obtained through SA Dziedzic's Affidavits. *See Rice*, 478 F.3d at 710.

**B.      Confidential Sources**

During this investigation, SA Dziedzic received information from confidential sources:

(1)      The phone number and contact person for QRMP;

(2)      The name of Dr. Milagros Ebreo's assistant (Dr. Ebreo is allegedly a physician who saw fake patients);

(3)      The visits with Dr. Ebreo initially occurred in a hotel in Southfield;

10

(4)    Between November 2007 and January 2008, the operation moved from the hotel to 20226 Stratford in Detroit;

(5)    CS1 earned approximately $220.00 per visit;

(6)    In 2007, CS3 purchased approximately 400 pills of 80mg OxyContin from Williams for $9,600.00; and

(7)    In July 2007, CS3 attempted to purchase additional OxyContin pills from Williams, but he raised the price of each pill by approximately three dollars.

SA Dziedzic's Affidavits also addressed the traditional investigative techniques.

### C.    Traditional Investigative Techniques Tried and Failed

SA Dziedzic said he tried three traditional investigative techniques that failed: (1) confidential sources; (2) physical surveillance; and (3) toll records.

### 1.    Confidential Sources

#### a.    CS1

SA Dziedzic tried to use CS1 to obtain evidence that Dr. Ebreo was writing illegitimate prescriptions, but his attempt was unsuccessful.

On May 28, 2008, SA Dziedzic recorded three voice mail messages from Young, in which she attempted to schedule an appointment for CS1 with Dr. Ebreo.

On July 2, 2008, SA Dziedzic monitored a consensual telephone call between CS1 and Young, in which CS1 attempted to schedule an appointment with Dr. Ebreo. During the conversation, Young informed CS1 that the rest of the week was booked, she "didn't think" CS1 would return for more visits since Young heard that "feds . . . like DEA" came to CS1's house, and Young no longer scheduled appointments.  SA Dziedzic believes Young was lying when she said she no longer scheduled appointments, and she tried to avoid talking to CS1 because she thought CS1 was

11

cooperating with law enforcement.

On July 8, 2008, SA Dziedzic monitored and recorded a conversation between CS1 and Young, in which Young said she had not yet received an appointment date for CS1.

On August 6, 2008, CS1 received a call from Young, in which Young asked CS1 whether CS1 was available for an immediate appointment. SA Dziedzic believes Young's contact with CS1 was out of desperation for fake patients to fulfill Williams' order for 12 fake patients on August 6, 2008. Based on a previous agreement between CS1 and controlling DEA agents, CS1 turned down the offer. In addition, SA Dziedzic believed that such short notice was inadequate to arrange for a covert enforcement operation. When CS1 asked Young for an appointment on another day, Young told CS1 she had an opening on August 6th, and could not give CS1 an appointment for another day.

Based on the July 2, 2008 and August 6, 2008 conversations, SA Dziedzic did not believe CS1 could continue his or her participation as a fake patient.

### b. CS3

When SA Dziedzic attempted to put CS3 in direct contact with Williams, CS3 told him that Williams stopped associating with CS3, after he learned CS3 was a target of a separate law enforcement investigation.

Further, CS3 told SA Dziedzic that Williams and his employees were secretive about the "medical business," and the employees' duties within the organization.

### 2. Physical Surveillance

12

### a.   20226 Stratford

Between March 2008 and August 2008, SA Dziedzic conducted physical surveillance of 20226 Stratford, a house that was allegedly used as an examination office under Williams' direction.  SA Dziedzic observed a significant amount of fake patients.  According to SA Dziedzic, the fake patients either arrived in personal vehicles, or were shuttled in by co-Defendant Gregory Palmer.

### b.   George Williams

SA Dziedzic conducted physical surveillance on Williams between January 2008 and September 2008.

However, SA Dziedzic said he was unclear where Williams lived.

In addition, while Williams and his associates frequented a high-rise apartment building in downtown Detroit, SA Dziedzic did not know which apartment, if any, was used for organizational purposes.

### c.   SA Dziedzic's Conclusions

SA Dziedzic said: (1) physical surveillance did not establish the roles of the named conspirators, identify additional conspirators, identify the pharmacies involved, or provide admissible evidence; (2) it is difficult to conduct surveillance of major drug traffickers over an extended period of time without detection, especially in a quiet residential neighborhood; (3) wiretap interceptions would pinpoint the starting times for surveillance, the locations of surveillance, and the events to be watched, which would reduce the length of surveillance and the chance of detection; and (4) physical surveillance did not reveal what happens to the controlled substances once the

13

prescriptions are obtained.

According to SA Dziedzic, even if successful, physical surveillance would not allow agents to gather all of the evidence necessary to prosecute sophisticated drug distribution organizations. Rather, it only allows agents to confirm meetings between conspirators, leaving them to speculate as to the purpose of the meetings observed.

Finally, SA Dziedzic said Williams or his associates could discover the physical surveillance and compromise the investigation.

### 3.    Toll Records

SA Dziedzic said toll records provided circumstantial evidence that the target telephones were used to make or receive calls. However, the toll records did not provide the content of the calls, the identity of the individuals making and receiving calls, nor did they achieve all of the investigative goals.

### D.    Traditional Techniques Which Reasonably Appeared Unlikely to Succeed if Tried or Were Too Dangerous to Try

SA Dziedzic said the following traditional investigative techniques reasonably appeared unlikely to succeed if tried or were too dangerous to try: (1) undercover agents; (2) Closed Circuit Pole Cameras; (3) trash searches; (4) consensual telephone calls; (5) a Grand Jury investigation; (6) search warrants; and (7) "flipping" individuals into informants.

### 1.    Undercover Agents

SA Dziedzic said it was impossible for the confidential sources to introduce an undercover agent, and he did not have any other avenues for the introduction of an undercover agent. According to SA Dziedzic, "[b]ased on intelligence derived from

14

CS1, it appears that each new 'fake patient' is recruited and subsequently introduced to YOUNG by previously established 'fake patients.'"

Further, SA Dziedzic said an undercover agent could not have conducted a cold "walk-in" and attempted to obtain an appointment; doing so would have confirmed the suspicion that the "feds" were investigating.  SA Dziedzic said that even if the "walk-in" was successful, the undercover agent would not have been privy to the full scope of all co-conspirator conversations and activities, and would not have been exposed to all subjects – including Williams or any other upper-level members of his organization.

### 2.      Closed Circuit Pole Cameras

SA Dziedzic said he considered using closed circuit television ("CCTV") surveillance, but decided against it for four reasons: (1) it is stationary and only captures individuals at precise locations; (2) the majority of the overt criminal activity occurred inside 20226 Stratford; (3) there was a risk that the CCTV could be discovered and compromise the investigation; and (4) the installation of a CCTV in the vicinity of the high-rise apartment building would have unlikely captured footage of evidentiary value.

### 3.      Trash Searches

SA Dziedzic said "[t]hrough my experience of investigating high-level organized traffickers and that of other agents with whom I have conferred, I know that many drug traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their trash containers to dispose of valuable information."

According to SA Dziedzic, it is not uncommon for drug traffickers to put trash in

commercial dumpsters to avoid examination by law enforcement.

Further, SA Dziedzic said that while a trash search may have identified documents pertaining to medical examinations, pharmacy wrappings, or documents pertaining to patient information, it would not have provided information as to who transported the prescriptions, which pharmacy filled the prescriptions, and where the narcotics were stashed.

Finally, SA Dziedzic said generally, multi-unit apartment buildings use a common trash dumpster, which would make it impossible to determine the trash that originated from Williams or his associates.

### 4. Consensual Telephone Calls

SA Dziedzic said drug traffickers are extremely careful when engaging in criminal conversations, and will not engage in such conversations with unknown individuals. SA Dziedzic said if agents attempted an undercover telephone call, the members of the organization would have been suspicious about how a person unfamiliar to them obtained their telephone numbers. SA Dziedzic said such action could raise suspicion resulting in the dumping of the phone.

### 5. A Grand Jury Investigation

SA Dziedzic said testimony before a Grand Jury would not have succeeded in exposing the full nature and scope of the criminal activity, or the identities of all the participants because: (1) it would have alerted the participants to the investigation, causing them to become more cautious or flee to avoid further investigation or prosecution; (2) if the participants were subpoenaed to the Grand Jury, it is likely they

would have invoked their Fifth Amendment rights and refused to testify; (3) granting immunity to the participants would have foreclosed prosecution; and (4) it is reasonable to expect that any physical evidence, such as narcotics, records, or drug proceeds would have been destroyed or hidden.

### 6.    Search Warrants

SA Dziedzic said "[t]he use of search warrants and interviews is premature.  At this juncture, these techniques would alert the INTERCEPTEES to the existence of the investigation and would prevent the DEA and the FBI from identifying the full scope of the conspiracy as well as other co-conspirators; additionally[,] it may lead to the targets of this investigation fleeing the jurisdiction."

### 7.    "Flipping" Individuals into Informants

SA Dziedzic considered flipping individuals in the organization into informants, but he believed such an attempt was too risky.  According to SA Dziedzic, if the individuals did not cooperate, the wiretap investigation would be compromised, and the agents would risk the chance of identifying the pharmacies and pharmacists involved.

## IV.    DEFENDANTS' OBJECTIONS

### A.    Necessity Requirement

According to Defendants, SA Dziedzic's Affidavits do not satisfy the necessity requirement; he did not submit "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" *See* 18 U.S.C. §2518(1)(c). Defendants say SA Dziedzic omitted relevant information, and did not provide legitimate

17

reasons as to why the normal investigative techniques were inadequate. According to

Defendants, if SA Dziedzic complied with the requirements of 18 U.S.C. §2518, he

would have conceded that all information sought through wiretaps was either already in

the agents' possession, or could have been obtained through search warrants.

### 1.    Information from Health and Human Services

Defendants say the Government had access to the following information from

HHS, or its contracting agents, before the AUSA filed the first wiretap Application:

(1)    every procedure, health complaint, and prescription written by Dr. Ebreo and
every other physician involved in the organization.

(2)    the date of the prescriptions, the date the prescriptions were filled, the quantity of
pills, and the pharmacy where the prescriptions were filled.

(3)    each physician that a patient consulted, each clinic where the patient was
treated, the amount billed, and the amount paid by the Government.

(4)    every patient, prescription, pharmacy, and physician connected or associated
with the alleged conspiracy.

According to Defendants, the Government did not need a wiretap to discover

fake patients, fake prescriptions, or to determine the pharmacies where the

prescriptions were filled.

### 2.    Search Warrants

Defendants say SA Dziedzic's sworn statements in his Affidavit for search

warrants proves: (1) search warrants would have revealed any additional information

sought by the Government; and (2) SA Dziedzic's statement in his Affidavits in support

of the wiretap Applications, that the use of search warrants was premature and would

prevent law enforcement from identifying the full scope of the conspiracy as well as

other co-conspirators, was incorrect.  According to Defendants, instead of waiting until November 2008, SA Dziedzic could have obtained search warrants before the AUSA applied for a wiretap in August 2008.

### 3.    Information Contained in SA Dziedzic's Affidavits in Support of the Wiretap Applications

Defendants say a wiretap investigation was not necessary because the agents: (1) had multiple confidential sources; (2) photographed fake patients; (3) knew where the relevant pharmacies were located; (4) knew where Williams, the physicians, and the employees lived; and (5) went to the business office in Southfield before applying for a wiretap.

Further, Defendants say SA Dziedzic's statement, that agents could not approach any of the co-conspirators, was incorrect; Dr. Ebreo was interviewed on November 25, 2008, and her conspicuous absence from the Indictment demonstrates that she is still cooperating with the Government.

Finally, Defendants say SA Dziedzic's Affidavits contain boilerplate language.

### 4.    Analysis

The Court finds the Government met its low burden of proof.  *See Lambert*, 771 F.2d at 91.

First, the information Defendants say was available from search warrants; and, HHS, or its contracting agents – before the AUSA applied for a wiretap – would not have achieved the goals of the wiretap investigation, which included:

(1)    identifying the places of operation, the locations used to conceal prescriptions, the identities and roles of the participants, the sources of the narcotics, and the methods of delivery;

19

(2)     determining how money flows to and from the organization; and

(3)     determining what happens to the controlled substances once the prescriptions are obtained.

Second, in SA Dziedzic's Affidavit for search warrants, he used intercepted telephone communications from the wiretap investigation to establish the probable cause necessary for a search warrant.

Third, the attempt to obtain information from Williams through CS3 was not successful, and SA Dziedzic was not sure where Williams lived.  Further, the Court is not required to deny a wiretap application because some investigative techniques were successful in uncovering some evidence of wrongdoing.  *See United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002).

Fourth, SA Dziedzic's statement, that approaching the co-conspirators was "too risky," and could compromise the wiretap investigation, was not incorrect.  According to Defendants, SA Dziedzic did not approach Dr. Ebreo for an interview until November 25, 2008 – after the wiretap investigation concluded.

Finally, while SA Dziedzic did use generic language in his Affidavits, he explained particularly why every traditional investigative technique failed, reasonably appeared unlikely to succeed if tried, or was too dangerous to try (except the Grand Jury investigation).

### B.     Charges in the Indictment

In a footnote, Williams objects to the Magistrate Judge's finding that he is charged in counts 9-17.  Williams says he is only charged in counts I, II, III, V, and VII.

In an e-mail dated March 5, 2010, the Government made it clear that Williams is

not charged in counts 9-17:

> The right to be indicted by a federal grand jury for a felony is an important
> constitutional right provided by the Fifth Amendment.  Since the Indictment
> is possibly ambiguous as to whether the Grand Jury actually indicted
> George Williams on those counts, the safer practice is to proceed as if he
> is NOT indicted on these counts.

## V.    REQUEST FOR EVIDENTIARY HEARING

Defendants' request for an evidentiary hearing is **DENIED**.  According to

Defendants, the Magistrate Judge heard "extensive oral arguments" on January 11,

2010, and she does not believe an evidentiary hearing is necessary.

In addition, the Court does not need to determine the extent of the information

Defendants allege SA Dziedzic omitted from his Affidavits.  The parties engaged in

extensive discovery, and Defendants presented the Court with the information they

believe SA Dziedzic omitted from his Affidavits.

Finally, SA Dziedzic's Affidavits dated August 5, 2008, October 7, 2008, and

November 6, 2008 say:

> Since this affidavit is being submitted for the limited purpose of securing
> authorization for the interception of wire communications, I have not
> included each and every fact known to me concerning this investigation.  I
> have only set forth the facts I believe are essential to establish the
> necessary foundation for an order authorizing the interception of wire
> communications.

Because the Court affords the issuing judge "considerable discretion" in deciding

whether other investigative techniques might be successfully employed, it declines

Defendants' request for an evidentiary hearing.  *See Landmesser*, 553 F.2d at 20 (citing

*United States v. Smith*, 519 F.2d 516, 518 (9th Cir. 1975); *United States v. Daly*, 535

F.2d 434, 438 (8th Cir. 1976)).  If the issuing judge needed additional information to

determine whether SA Dziedzic's Affidavits satisfy the necessity requirement, he could

have asked SA Dziedzic what additional facts he knew about the investigation.

**VI.    CONCLUSION**

The Court **ADOPTS** the Magistrate Judge's R&R; Defendant's motion is

**DENIED**.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 8, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 8, 2010.

s/Carol A. Pinegar
Deputy Clerk